LINGLE *v.* NORGE DIVISION OF MAGIC CHEF, INC.

No. 87–259.   Argued March 23, 1988—Decided June 6, 1988

STEVENS, J., delivered the opinion for a unanimous Court.

*Paul Alan Levy* argued the cause for petitioner. With him on the briefs was *Alan B. Morrison.*

*Charles C. Jackson* argued the cause for respondent. With him on the brief were *J. Stephen Poor, P. Michael Kimmel,* and *Edward H. Graham.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Minnesota et al. by *Hubert H. Humphrey III,* Attorney General of Minnesota, and *Steven M. Gunn* and *Scott R. Strand,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Joseph I. Lieberman* of Connecticut, *Warren Price III* of Hawaii, *Neil F. Hartigan* of Illinois, *David L. Armstrong* of Kentucky, *James E. Tierney* of Maine, *William L. Webster* of Missouri, *Robert M. Spire* of Nebraska, *W. Cary Edwards* of New Jersey, *Hal Stratton* of New Mexico, *Anthony J. Celebrezze* of Ohio, Dave Frohnmayer of Oregon, *Jim Mattox* of Texas, *Jeffrey L. Amestoy* of Vermont, *Kenneth O. Eikenberry* of Washington,

JUSTICE STEVENS delivered the opinion of the Court.

In Illinois an employee who is discharged for filing a worker's compensation claim may recover compensatory and punitive damages from her employer. The question presented in this case is whether an employee covered by a collective-bargaining agreement that provides her with a contractual remedy for discharge without just cause may enforce her state-law remedy for retaliatory discharge. The Court of Appeals held that the application of the state tort remedy was pre-empted by § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185. 823 F. 2d 1031 (CA7 1987) (en banc). We disagree.

I

Petitioner was employed in respondent's manufacturing plant in Herrin, Illinois. On December 5, 1984, she notified respondent that she had been injured in the course of her employment and requested compensation for her medical expenses pursuant to the Illinois Workers' Compensation Act. On December 11, 1984, respondent discharged her for filing a "false worker's compensation claim." *Id.*, at 1033.

The union representing petitioner promptly filed a grievance pursuant to the collective-bargaining agreement that covered all production and maintenance employees in the Herrin plant. The agreement protected those employees, including petitioner, from discharge except for "proper" or "just" cause, App. 13–14, and established a procedure for the arbitration of grievances, *id.*, at 10–11. The term grievance

*Charles G. Brown* of West Virginia, and *Donald J. Hanaway* of Wisconsin; for the American Federation of Labor and Congress of Industrial Organizations by *Marsha S. Berzon, David Silberman,* and *Laurence Gold;* and for the National Conference of State Legislatures et al. by *Benna Ruth Solomon, Beate Bloch, James E. Pfander,* and *Cynthia M. Moore.*

Briefs of *amici curiae* urging affirmance were filed for the Chamber of Commerce of the United States of America by *Peter G. Nash, Dixie L. Atwater,* and *Stephen A. Bokat;* and for the Equal Employment Advisory Council by *Robert E. Williams* and *Douglas S. McDowell.*

was broadly defined to encompass "any dispute between . . . the Employer and any employee, concerning the effect, interpretation, application, claim of breach or violation of this Agreement." *Id.*, at 10. Ultimately, an arbitrator ruled in petitioner's favor and ordered respondent to reinstate her with full backpay. See *id.*, at 25–26.

Meanwhile, on July 9, 1985, petitioner commenced this action against respondent by filing a complaint in the Illinois Circuit Court for Williamson County, alleging that she had been discharged for exercising her rights under the Illinois workers' compensation laws. App. 2–4; see *Kelsay* v. *Motorola, Inc.*, 74 Ill. 2d 172, 384 N. E. 2d 353 (1978); *Midgett* v. *Sackett-Chicago, Inc.*, 105 Ill. 2d 143, 473 N. E. 2d 1280 (1984); see also Ill. Rev. Stat., ch. 48, ¶ 138.4(h) (1987). Respondent removed the case to the Federal District Court on the basis of diversity of citizenship, and then filed a motion praying that the court either dismiss the case on pre-emption grounds or stay further proceedings pending the completion of the arbitration. Record, Doc. No. 7. Relying on our decision in *Allis-Chalmers Corp.* v. *Lueck*, 471 U. S. 202 (1985), the District Court dismissed the complaint. It concluded that the "claim for retaliatory discharge is 'inextricably intertwined' with the collective bargaining provision prohibiting wrongful discharge or discharge without just cause" and that allowing the state-law action to proceed would undermine the arbitration procedures set forth in the parties' contract. 618 F. Supp. 1448, 1449 (SD Ill. 1985).

The Court of Appeals agreed that the state-law claim was pre-empted by § 301. In an en banc opinion, over the dissent of two judges, it rejected petitioner's argument that the tort action was not "inextricably intertwined" with the collective-bargaining agreement because the disposition of a retaliatory discharge claim in Illinois does not depend upon an interpretation of the agreement; on the contrary, the court concluded that "the same analysis of the facts" was implicated under both procedures. 823 F. 2d, at 1046. It took note of, and

declined to follow, contrary decisions in the Tenth, Third, and Second Circuits.[1] We granted certiorari to resolve the conflict in the Circuits. 484 U. S. 895 (1987).

## II

Section 301(a) of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U. S. C. § 185(a), provides:

> "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

In *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448 (1957), we held that § 301 not only provides federal-court jurisdiction over controversies involving collective-bargaining agreements, but also "authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements." *Id.*, at 451.[2]

In *Teamsters* v. *Lucas Flour Co.*, 369 U. S. 95 (1962), we were confronted with a straightforward question of contract interpretation: whether a collective-bargaining agreement implicitly prohibited a strike that had been called by the union. The Washington Supreme Court had answered that question by applying state-law rules of contract interpreta-

---

[1] *Peabody Galion* v. *Dollar*, 666 F. 2d 1309 (CA10 1981); *Herring* v. *Prince Macaroni of New Jersey, Inc.*, 799 F. 2d 120, 124, n. 2 (CA3 1986); *Baldracchi* v. *Pratt & Whitney Aircraft Div., United Technologies Corp.*, 814 F. 2d 102 (CA2 1987); but see *Johnson* v. *Hussmann Corp.*, 805 F. 2d 795 (CA8 1986) (retaliatory discharge claim pre-empted by § 301).

[2] We later concluded that state courts have concurrent jurisdiction over § 301 claims. *Charles Dowd Box Co.* v. *Courtney*, 368 U. S. 502 (1962). State as well as federal courts must apply federal law in deciding these claims. See *Teamsters* v. *Lucas Flour Co.*, 369 U. S. 95, 102 (1962).

tion.  We rejected that approach, and held that § 301 mandated resort to federal rules of law in order to ensure uniform interpretation of collective-bargaining agreements, and thus to promote the peaceable, consistent resolution of labor-management disputes.[3]

---

[3] Our discussion of the pre-emptive scope of § 301 bears repeating:

"It was apparently the theory of the Washington court that, although *Textile Workers Union* v. *Lincoln Mills,* 353 U. S. 448, requires the federal courts to fashion, from the policy of our national labor laws, a body of federal law for the enforcement of collective-bargaining agreements, nonetheless, the courts of the States remain free to apply individualized local rules when called upon to enforce such agreements.  This view cannot be accepted.  The dimensions of § 301 require the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute.  Comprehensiveness is inherent in the process by which the law is to be formulated under the mandate of *Lincoln Mills,* requiring issues raised in suits of a kind covered by § 301 to be decided according to the precepts of federal labor policy.

"More important, the subject matter of § 301(a) 'is peculiarly one that calls for uniform law.' . . . The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.  Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract.  Once the collective bargain was made, the possibility of conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to its interpretation.  Indeed, the existence of possibly conflicting legal concepts might substantially impede the parties' willingness to agree to contract terms providing for final arbitral or judicial resolution of disputes.

"The importance of the area which would be affected by separate systems of substantive law makes the need for a single body of federal law particularly compelling.  The ordering and adjusting of competing interests through a process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace.  State law which frustrates the effort of Congress to stimulate the smooth functioning of that process thus strikes at the very core of federal labor policy.  With due regard to the many factors which bear upon competing state and fed-

In *Allis-Chalmers Corp.* v. *Lueck*, 471 U. S. 202 (1985), we considered whether the Wisconsin tort remedy for bad-faith handling of an insurance claim could be applied to the handling of a claim for disability benefits that were authorized by a collective-bargaining agreement. We began by examining the collective-bargaining agreement, and determined that it provided the basis not only for the benefits, but also for the right to have payments made in a timely manner. *Id.*, at 213–216. We then analyzed the Wisconsin tort remedy, explaining that it "exists for breach of a 'duty devolv[ed] upon the insurer by reasonable implication from the express terms of the contract,' the scope of which, crucially, is 'ascertained from a consideration of the contract itself.'" *Id.*, at 216 (quoting *Hilker* v. *Western Automobile Ins. Co.*, 204 Wis. 1, 16, 235 N. W. 413, 415 (1931)). Since the "parties' agreement as to the manner in which a benefit claim would be handled [would] necessarily [have been] relevant to any allegation that the claim was handled in a dilatory manner," 471 U. S., at 218, we concluded that § 301 pre-empted the application of the Wisconsin tort remedy in this setting.

Thus, *Lueck* faithfully applied the principle of § 301 pre-emption developed in *Lucas Flour:*[4] if the resolution of a

eral interests in this area, . . . we cannot but conclude that in enacting § 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." 369 U. S., at 103–104 (citations omitted; footnote omitted).

[4] We applied this same principle of § 301 pre-emption just last Term to a case in which the plaintiff had conceded that the "'nature and scope of the duty of care owed [her] is determined by reference to the collective bargaining agreement.'" *Electrical Workers* v. *Hechler*, 481 U. S. 851, 863, n. 5 (1987) (citation omitted). Plaintiff had brought a Florida tort law claim alleging that her union had "breached its duty of care to provide a union member with a safe workplace." *Id.*, at 853. Our analysis of Florida law revealed that "[t]he threshold inquiry for determining if a cause of action exists is an examination of the contract to ascertain what duties were accepted by each of the parties and the scope of those duties." *Id.*, at 860. Thus agreeing with the characterization of Florida law embodied in plaintiff's concession, we concluded that § 301 pre-empted the state-law

state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles—necessarily uniform throughout the Nation—must be employed to resolve the dispute.[5]

### III

Illinois courts have recognized the tort of retaliatory discharge for filing a worker's compensation claim, *Kelsay* v. *Motorola, Inc.*, 74 Ill. 2d 172, 384 N. E. 2d 353 (1978),[6] and

claim. See also *Republic Steel Corp.* v. *Maddox*, 379 U. S. 650 (1965) (state-law application to suit for severance pay under collective-bargaining agreement pre-empted by § 301).

[5] We have twice applied the *Lucas Flour* § 301 pre-emption principle in determining whether a state-law claim brought in state court was properly removed to federal court. In *Avco Corp.* v. *Machinists*, 390 U. S. 557 (1968), we determined that a state-law suit brought in state court to enjoin a strike was properly removed to federal court despite the plaintiff's failure to plead a federal cause of action, because "the pre-emptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization.'" *Franchise Tax Bd. of California* v. *Construction Laborers Vacation Trust for Southern California*, 463 U. S. 1, 23 (1983) (quoting § 301). Conversely, in *Caterpillar Inc.* v. *Williams*, 482 U. S. 386 (1987), see n. 10, *infra*, we held that a state-law complaint brought in state court for breach of *individual* employment contracts was not "completely pre-empted" by § 301, 482 U. S., at 394, because § 301 "says nothing about the content or validity of *individual* employment contracts." *Ibid.* (emphasis added). Both *Avco* and *Caterpillar* are examples of the *Lucas Flour* § 301 pre-emption principle: in the former case, plaintiff's claim required construing the collective-bargaining agreement in question; in the latter case, plaintiffs' claim did not turn on any collective-bargaining agreement interpretation.

[6] Although the cause of action was not based on any specific statutory provision, the following section of the Illinois Workers' Compensation Act expresses the public policy underlying the common-law development:

"It shall be unlawful for any employer, insurance company or service or adjustment company to interfere with, restrain or coerce an employee in any manner whatsoever in the exercise of the rights or remedies granted to him or her by this Act or to discriminate, attempt to discriminate, or

have held that it is applicable to employees covered by union contracts, *Midgett* v. *Sackett-Chicago, Inc.*, 105 Ill. 2d 143, 473 N. E. 2d 1280 (1984), cert. denied, 474 U. S. 909 (1985). "[T]o show retaliatory discharge, the plaintiff must set forth sufficient facts from which it can be inferred that (1) he was discharged or threatened with discharge and (2) the employer's motive in discharging or threatening to discharge him was to deter him from exercising his rights under the Act or to interfere with his exercise of those rights." *Horton* v. *Miller Chemical Co.*, 776 F. 2d 1351, 1356 (CA7 1985) (summarizing Illinois state-court decisions), cert. denied, 475 U. S. 1122 (1986); see *Gonzalez* v. *Prestress Engineering Corp.*, 115 Ill. 2d 1, 503 N. E. 2d 308 (1986). Each of these purely factual questions pertains to the conduct of the employee and the conduct and motivation of the employer. Neither of the elements requires a court to interpret any term of a collective-bargaining agreement. To defend against a retaliatory discharge claim, an employer must show that it had a nonretaliatory reason for the discharge, cf. *Loyola University of Chicago* v. *Illinois Human Rights Comm'n,* 149 Ill. App. 3d 8, 500 N. E. 2d 639 (1986); this purely factual inquiry likewise does not turn on the meaning of any provision of a collective-bargaining agreement. Thus, the state-law remedy in this case is "independent" of the collective-bargaining agreement in the sense of "'independent" that matters for § 301 pre-emption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement.[7]

---

threaten to discriminate against an employee in any way because of the exercise of his or her rights granted to him or her by this Act.

"It shall be unlawful for any employer, individually or through any insurance company or service or adjustment company, to discharge or threaten to discharge, or to refuse to rehire or recall to active service in a suitable capacity an employee because of the exercise of his or her rights or remedies granted him or her by this Act." Ill. Rev. Stat., ch. 48, ¶ 138.4(h) (1987).

[7] Such independence was not present either in *Lucas Flour*, *Allis-Chalmers Corp.* v. *Lueck*, 471 U. S. 202 (1985), or *Electrical Workers*

The Court of Appeals seems to have relied upon a different way in which a state-law claim may be considered "independent" of a collective-bargaining agreement. The court wrote that "the just cause provision in the collective-bargaining agreement may well prohibit such retaliatory discharge," and went on to say that if the state-law cause of action could go forward, "a state court would be deciding precisely the *same issue* as would an arbitrator: whether there was 'just cause' to discharge the worker." 823 F. 2d, at 1046 (emphasis added). The court concluded, "the state tort of retaliatory discharge is inextricably intertwined with the collective-bargaining agreements here, because it implicates the *same analysis of the facts* as would an inquiry under the just cause provisions of the agreements." *Ibid.* (emphasis added). We agree with the court's explanation that the state-law analysis might well involve attention to the same factual considerations as the contractual determination of whether Lingle was fired for just cause. But we disagree with the court's conclusion that such parallelism renders the state-law analysis dependent upon the contractual analysis. For while there may be instances in which the National Labor Relations Act pre-empts state law on the basis of the subject mat-

---

v. *Hechler*, 481 U. S. 851 (1987); see n. 4, *supra*. In all of those cases, pertinent principles of state law required construing the relevant collective-bargaining agreement. Not so here.

Petitioner points to the fact that the Illinois right to be free from retaliatory discharge is nonnegotiable and applies to unionized and nonunionized workers alike. While it may be true that most state laws that are not pre-empted by § 301 will grant nonnegotiable rights that are shared by all state workers, we note that neither condition ensures nonpre-emption. It is conceivable that a State could create a remedy that, although nonnegotiable, nonetheless turned on the interpretation of a collective-bargaining agreement for its application. Such a remedy would be pre-empted by § 301. Similarly, if a law applied to all state workers but required, at least in certain instances, collective-bargaining agreement interpretation, the application of the law in those instances would be pre-empted. Conversely, a law could cover only unionized workers but remain unpreempted if no collective-bargaining agreement interpretation was needed to resolve claims brought thereunder.

ter of the law in question,[8] § 301 pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements.[9]  In other words, even if dispute resolu-

---

[8] Although § 301 pre-empts state law only insofar as resolution of the state-law claim requires the interpretation of a collective-bargaining agreement, and although § 301 pre-emption is all that is at issue in this case, it is important to remember that other federal labor-law principles may pre-empt state law.  Thus, in *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 244 (1959), we held that "[w]hen it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act [NLRA], or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield."  We added that "courts are not primary tribunals to adjudicate . . . issues" such as "whether the particular activity regulated by the States [is] governed by § 7 or § 8 or [is], perhaps, outside both these sections."  *Ibid.*  Rather, "[i]t is essential to the administration of the [NLRA] that these determinations be left in the first instance to the National Labor Relations Board."  *Id.,* at 244–245.

"A second pre-emption doctrine protects against state interference with policies implicated by the structure of the [NLRA] itself, by pre-empting state law and state causes of action concerning conduct that Congress intended to be unregulated."  *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S. 724, 749 (1985).  This doctrine "was designed, at least initially, to govern pre-emption questions that arose concerning activity that was neither arguably protected against employer interference by §§ 7 and 8(a)(1) of the NLRA, nor arguably prohibited as an unfair labor practice by § 8(b) of that Act. . . . Such action falls outside the reach of *Garmon* pre-emption."  *Ibid.*  We referred to this second pre-emption doctrine in *Metropolitan Life* as "*Machinists* pre-emption," after *Machinists* v. *Wisconsin Employment Relations Comm'n,* 427 U. S. 132 (1976), in which we had "ruled that a State may not penalize a concerted refusal to work overtime that was neither prohibited nor protected under the NLRA."  471 U. S., at 750.

[9] Whether a union may *waive* its members' individual, nonpre-empted state-law rights, is, likewise, a question distinct from that of whether a claim is pre-empted under § 301, and is another issue we need not resolve today.  We note that under Illinois law, the parties to a collective-bargaining agreement may not waive the prohibition against retaliatory discharge nor may they alter a worker's rights under the state worker's

tion pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for §301 pre-emption purposes.[10]

## IV

The result we reach today is consistent both with the policy of fostering uniform, certain adjudication of disputes over the

---

compensation scheme. *Byrd* v. *Aetna Casualty & Surety Co.*, 152 Ill. App. 3d 292, 298, 504 N. E. 2d 216, 221, app. denied, 115 Ill. 2d 539, 511 N. E. 2d 426 (1987). Before deciding whether such a state-law bar to waiver could be pre-empted under federal law by the parties to a collective-bargaining agreement, we would require "clear and unmistakable" evidence, see *Metropolitan Edison Co.* v. *NLRB*, 460 U. S. 693, 708 (1983), in order to conclude that such a waiver had been intended. No such evidence is available in this case.

[10] Thus, what we said in *Caterpillar Inc.* v. *Williams*, 482 U. S., at 394–395 (emphasis in original), see n. 5, *supra*, is relevant here:

"Caterpillar asserts that respondents' state-law contract claims are in reality completely pre-empted §301 claims, which therefore arise under federal law. We disagree. Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.' *Electrical Workers* v. *Hechler*, 481 U. S. 851, 859, n. 3 (1987); see also *Allis-Chalmers Corp.* v. *Lueck*, 471 U. S., at 220. Respondents allege that Caterpillar has entered into and breached *individual* employment contracts with them. Section 301 says nothing about the content or validity of individual employment contracts. It is true that respondents, bargaining unit members at the time of the plant closing, possessed substantial rights under the collective agreement, and could have brought suit under §301. As masters of the complaint, however, they chose not to do so.

"Moreover, contrary to Caterpillar's assertion, . . . respondents' complaint is not substantially dependent upon interpretation of the collective-bargaining agreement. It does not rely upon the collective agreement indirectly, nor does it address the relationship between the individual contracts and the collective agreement. As the Court has stated, 'it would be inconsistent with congressional intent under [§301] to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.' *Allis-Chalmers Corp.*, *supra*, at 212."

meaning of collective-bargaining agreements and with cases that have permitted separate fonts of substantive rights to remain unpre-empted by other federal labor-law statutes.

First, as we explained in *Lueck*, "[t]he need to preserve the effectiveness of arbitration was one of the central reasons that underlay the Court's holding in *Lucas Flour*." 471 U. S., at 219. "A rule that permitted an individual to sidestep available grievance procedures would cause arbitration to lose most of its effectiveness, . . . as well as eviscerate a central tenet of federal labor contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance." *Id.*, at 220. See *Paperworkers* v. *Misco, Inc.*, 484 U. S. 29 (1987); *Steelworkers* v. *Enterprise Wheel & Car Corp.*, 363 U. S. 593 (1960). Today's decision should make clear that interpretation of collective-bargaining agreements remains firmly in the arbitral realm;[11] judges can determine questions of state law involving labor-management relations only if such questions do not require construing collective-bargaining agreements.

Second, there is nothing novel about recognizing that substantive rights in the labor relations context can exist without interpreting collective-bargaining agreements.

> "This Court has, on numerous occasions, declined to hold that individual employees are, because of the availability of arbitration, barred from bringing claims under federal statutes. See, *e. g.*, *McDonald* v. *West Branch*, 466 U. S. 284 (1984); *Barrentine* v. *Arkansas-Best Freight System, Inc.*, 450 U. S. 728 (1981); *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974). Although the analysis of the question under each statute is quite distinct, the theory running through these cases is that

---

[11] Arbitrators are delegated by nearly all collective-bargaining agreements as the adjudicators of contract disputes. See *Paperworkers* v. *Misco, Inc.*, 484 U. S. 29, 36 (1987); Bureau of National Affairs, Inc., Basic Patterns in Union Contracts 37 (11th ed. 1986) ("Arbitration is called for in 99 percent of the sample contracts").

> notwithstanding the strong policies encouraging arbitration, 'different considerations apply *where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers.' Barrentine, supra,* at 737." *Atchison, T. & S. F. R. Co.* v. *Buell,* 480 U. S. 557, 564–565 (1987) (emphasis added).

Although our comments in *Buell,* construing the scope of Railway Labor Act pre-emption, referred to independent *federal* statutory rights, we subsequently rejected a claim that federal labor law pre-empted a *state* statute providing a one-time severance benefit to employees in the event of a plant closing. In *Fort Halifax Packing Co.* v. *Coyne,* 482 U. S. 1, 21 (1987), we emphasized that "pre-emption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State." We specifically held that the Maine law in question was not pre-empted by the NLRA, "since its establishment of a minimum labor standard does not impermissibly intrude upon the collective-bargaining process." *Id.,* at 23.

The Court of Appeals "recognize[d] that § 301 does not pre-empt state anti-discrimination laws, even though a suit under these laws, like a suit alleging retaliatory discharge, requires a state court to determine whether just cause existed to justify the discharge." 823 F. 2d, at 1046, n. 17. The court distinguished those laws because Congress has affirmatively endorsed state antidiscrimination remedies in Title VII of the Civil Rights Act of 1964, 78 Stat. 241, see 42 U. S. C. §§ 2000e–5(c) and 2000e–7, whereas there is no such explicit endorsement of state workers' compensation laws. As should be plain from our discussion in Part III, *supra,* this distinction is unnecessary for determining whether § 301 pre-empts the state law in question. The operation of the antidiscrimination laws does, however, illustrate the relevant point for § 301 pre-emption analysis that the mere fact that a broad contractual protection against discriminatory—or retalia-

tory—discharge may provide a remedy for conduct that co-incidentally violates state law does not make the existence or the contours of the state-law violation dependent upon the terms of the private contract. For even if an arbitrator should conclude that the contract does not prohibit a particular discriminatory or retaliatory discharge, that conclusion might or might not be consistent with a proper interpretation of state law. In the typical case a state tribunal could resolve either a discriminatory or retaliatory discharge claim without interpreting the "just cause" language of a collective-bargaining agreement.

## V

In sum, we hold that an application of state law is pre-empted by § 301 of the Labor Management Relations Act of 1947 only if such application requires the interpretation of a collective-bargaining agreement.[12]

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

---

[12] A collective-bargaining agreement may, of course, contain information such as rate of pay and other economic benefits that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled. See *Baldracchi* v. *Pratt & Whitney Aircraft Div., United Technologies Corp.*, 814 F. 2d, at 106. Although federal law would govern the interpretation of the agreement to determine the proper damages, the underlying state-law claim, not otherwise pre-empted, would stand. Thus, as a general proposition, a state-law claim may depend for its resolution upon both the interpretation of a collective-bargaining agreement and a separate state-law analysis that does not turn on the agreement. In such a case, federal law would govern the interpretation of the agreement, but the separate state-law analysis would not be thereby pre-empted. As we said in *Allis-Chalmers Corp.* v. *Lueck*, 471 U. S., at 211, "not every dispute . . . tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 . . . ."